FILED
U.S. DISTRICT COURT
DISTRICT OF WYOMING

2015 OCT  9  PM 1 14

STEPHAN HARRIS, CLERK
CHEYENNE

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF WYOMING

ELIZABETH BRENNER, as Trustee for the heirs
and next-of-kin of THOMAS LEVI PLOTKIN,

    Plaintiff,

vs.

                              Case No. 14-CV-130-J

NATIONAL OUTDOOR LEADERSHIP SCHOOL,

    Defendant.

## ORDER GRANTING DEFENDANT'S MOTION TO DISMISS
## ALL CLAIMS FOR RELIEF

The defendant's motion to dismiss the above captioned action pursuant to Fed. R.

Civ. P. 12(b)(6) (Doc. 32), plaintiff's opposition thereto (Doc.43), and defendant's further

reply (Doc. 44) have come before the Court for consideration.  The Court has reviewed the

parties' written submissions and the applicable law and finds that the defendant's motion

should be granted, for the reasons stated below.

### Standard of Review

The standard of review for a Rule 12(b)(6) motion to dismiss applies here.  In

*Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct. 1937 (2009), the Supreme Court articulated a

two-step approach for district courts to use when considering a motion to dismiss under

1

Fed. R. Civ. P. 12(b)(6).  *See* 556 U.S. at 679; 129 S.Ct. at 1950.  First, "a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth."  *Id. Iqbal* clarified that "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions," and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Id.*, 556 U.S. at 278, 129 S.Ct. at 1949.

Second, "[w]hen there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief."  *Id.,* 556 U.S. at 679, 129 S.Ct. at 1950.  The Court has stated that "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  *Id.*, 556 U.S. at 678, 129 S.Ct. at 1949. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*  Plausibility lies somewhere between possibility and probability; a complaint must establish more than a mere possibility that the defendant acted unlawfully but the complaint does not need to establish that the defendant probably acted unlawfully.  *See id.*  "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."  *Id.,*556 U.S. at 679, 129 S.Ct. at 1950.  Thus, the mere metaphysical possibility that some plaintiff could prove some set of facts in support of the pleaded claims

2

is insufficient; the complaint must give the court reason to believe that this plaintiff has a

reasonable likelihood of mustering factual support for these claims." *Ridge at Red Hawk,*

*LLC v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007).

Continuing the discussion regarding the *Iqbal/Twombly* standard for review of

motions to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), the Tenth Circuit stated in *Kansas*

*Penn Gaming, LLC v. Collins*, 656 F.3d 1210, 1215 (10th Cir. 2013):

> This pleading requirement serves two purposes: "to ensure that a
> defendant is placed on notice of his or her alleged misconduct sufficient to
> prepare an appropriate defense," and "to avoid ginning up the costly
> machinery associated with our civil discovery regime on the basis of 'a
> largely groundless claim.'" *Pace v. Swerdlow*, 519 F.3d 1067, 1076 (10th Cir.
> 2008) (Gorsuch, J., concurring) (quoting *Twombly*, 550 U.S. at 557, 127
> S.Ct. 1955).

> Since these decisions, courts have struggled to apply the new
> pleading standard consistently. The primary source of confusion has been
> the meaning of the term "plausibility." According to the Supreme Court, "the
> plausibility standard ... asks for more than a sheer possibility" of unlawful
> conduct:

>> A claim has facial plausibility when the plaintiff pleads factual
>> content that allows the court to draw the reasonable inference
>> that the defendant is liable for the misconduct alleged. The
>> plausibility standard is not akin to a "probability requirement,"
>> but it asks for more than a sheer possibility that a defendant
>> has acted unlawfully. Where a complaint pleads facts that are
>> merely consistent with a defendant's liability, it stops short of
>> the line between possibility and plausibility of entitlement to
>> relief.

> *Iqbal*, 129 S.Ct. at 1949 (quotations omitted).

> Applying this standard, we have stated that "plausibility" refers to "the
> scope of the allegations in a complaint: if they are so general that they
> encompass a wide swath of conduct, much of it innocent, then the plaintiffs
> 'have not nudged their claims across the line from conceivable to plausible.'"

3

*Robbins v. Okla. ex rel. Dep't of Human Servs.*, 519 F.3d 1242, 1247 (10th Cir. 2008) (quoting *Twombly*, 550 U.S. at 570, 127 S.Ct. 1955).

The nature and specificity of the allegations required to state a plausible claim will vary based on context. *Smith v. United States*, 561 F.3d 1090, 1104 (10th Cir. 2009) (addressing an Eighth Amendment conspiracy); *Gee v. Pacheco*, 627 F.3d 1178, 1185 (10th Cir. 2010) (resolving a prisoner complaint). "The *Twombly* standard may have greater bite" in the context of a § 1983 claim against individual government actors, because "they typically include complex claims against multiple defendants." *Robbins*, 519 F.3d at 1249. "[I]t is particularly important in such circumstances that the complaint make clear exactly who is alleged to have done what to whom, to provide each individual with fair notice as to the basis of the claims against him or her, as distinguished from collective allegations against the state." *Id.* at 1250.

With this guidance, the Court now turns to the defendant's motion seeking to dismiss all claims for relief asserted in plaintiff's complaint.

## Background

Plaintiff Elizabeth Brenner's (sometimes "Brenner")[1] complaint was filed in the

---

[1]Ms. Brenner brings this wrongful death action in her capacity as Trustee for the heirs and next of kin of Thomas Levi Plotkin, having been appointed and qualified to serve pursuant to Minnesota law. Plaintiff's response, Doc. 43, n. 1. Ms. Brenner is mother of the deceased, Mr. Plotkin. Minnesota's statutory scheme is not unlike Wyoming's, in that a wrongful death action must be brought on behalf of heirs and beneficiaries identified in the statutes, rather than on behalf of the estate. See M.S.A. § 573.02; Wyo. Stat. § 1-38-102. The action in this case was filed in the Minnesota state district court September 18, 2013; the accident in which Plotkin died occurred on September 22, 2011. His body was never found. There is no dispute that the action was commenced in a timely fashion nor is there a dispute that Ms. Brenner is a wrongful death trustee seeking recovery on behalf of heirs and next of kin of Mr. Plotkin and not on behalf of his estate. That this Court has diversity jurisdiction pursuant to 28 U.S.C. §1332 is not in dispute. Ms. Brenner filed this action in the first instance in Minnesota state court in a representative capacity, having been appointed Trustee for heirs and next of kin of her son under Minnesota law. As the
(continued...)

Fourth Judicial District Court in the State of Minnesota on September 18, 2013.   On October 22, 2013, the defendant National Outdoor Leadership School ("NOLS") removed the matter to the United States District Court for the District of Minnesota, pursuant to 28 U.S.C. § 1441.   Subsequently, by separate order of May 19, 2014, the matter was transferred by the United States District Court for the District of Minnesota to the United States District Court for the District of Wyoming, pursuant to 28 U.S.C. § 1404.  See U.S. District Court for the District of Wyoming, *Brenner v. NOLS*, 14-CV-130, Doc. 22 (the Minnesota District Court's Order transferring to this District).

Brenner brings this wrongful death action in her capacity as Trustee for the heirs and next of kin of her son, Thomas Plotkin ("Plotkin").  Complaint ¶ 1, 2.   Much of the background included here is included in the Minnesota United States District Court's order granting the motion to transfer proceedings to this District.  See Doc. 22.  This wrongful

---

[1](...continued)
Wyoming Supreme Court has recognized for years, a personal representative acting on behalf of potential beneficiaries bringing a wrongful death suit does not perform duties as administrator of the estate.  The Court has discovered no law that suggests the appointment of Ms. Brenner as Trustee for the heirs and next of kin in Minnesota should no longer be given effect after the removal and eventual transfer to this Wyoming Federal District Court.  Removal is not a club that would permit a removing defendant to manipulate such procedural devices to their benefit and to the detriment of plaintiff. The instant action was commenced in a timely fashion under either Wyoming or Minnesota law.  Brenner was properly appointed under Minnesota law.  Although it will not be necessary to do so given the Court's disposition of the motion, the Court would permit Brenner to conform her pleadings to the requirements of Wyoming law providing for appointment of a personal representative. Because this action was commenced originally in Minnesota state court and subsequently removed to federal court, compliance with Wyoming's law relating to appointment of personal representatives in a wrongful death action would relate back to the date the original complaint was filed in Minnesota state court.

death dispute arises out of Plotkin's September 2011 death while participating in a NOLS

Semester in India course. *Id.* ¶ 12-18.  NOLS, a Wyoming corporation, organizes remote

wilderness expeditions for students for the purpose of teaching students technical outdoor

skills, leadership and environmental ethics.  *Id.* ¶ 4, 6.  Some time prior to April 6, 2011,

Plotkin applied to enroll in the Semester in India course, which was scheduled to begin

August 23, 2011, continuing through November 10, 2011.  *Id.* ¶ *12,*

Plotkin enrolled in the NOLS course in April 2011. He was sent an enrollment packet

with forms to be returned to NOLS.  *Id.* ¶ 13, 14.  The package of forms included

documents about the NOLS mission and values statement:

> **Safety**
> We accept risk as an integral part of the learning process and of the
> environments through which we travel. **The recognition and management
> of risk is critical to** both the development of leadership and to **the safety
> and health of our students** and staff.  We believe successful risk
> management stems from good judgment based on experience, training and
> knowledge. [Emphasis added.]

*Id.* ¶ 16. (Emphasis in original complaint.)

The packet also included a list outlining what students might expect in the course,

including "well-trained and qualified instructors."  *Id.* ¶ 17.  The course included five

sections: Wilderness Advanced First Aid, Whitewater Rafting, a Cultural Home Stay and

Environmental Studies, Backpacking in the Himalayas, and an Independent Student

Expedition.  *Id.* ¶ 18.  Plotkin flew to India August 24, 2011 and soon after arrival he

completed a five day Wilderness Advanced First Aid course at the base camp. *Id.* ¶¶ 19,

20.  September 1, 2011 Plotkin and the rest of the students prepared for the 30 day

backpacking portion of the course traveling by foot through various river valleys in the Himalayas, which consisted of a hiking section and orientation and packing. *Id.* ¶ 21. September 2, 2011 the group departed base camp and drove 150 miles to a village near the trail head. The next day, September 3, students began hiking for the trail head along a trail that follows the Gori Ganga River. There were three hiking groups consisting of five students each. Students were assigned leadership roles as a method of teaching them to focus on navigation, self-governance, and risk management. *Id.* ¶ 22. Some students did not have backpacking experience. *Id.* ¶ 23. The students were accompanied by NOLS leaders and instructors on the backpacking section of the course. *Id.* ¶ 24.

The course description Plotkin received from NOLS stated that students would gain and lose 2,000 feet of elevation on some days and "work hard traveling over steep, rocky terrain at high altitude with all [their] gear on [their] back." NOLS recognized in the course description that dangers of traveling in the Himalayas included falls on steep terrain and carrying very heavy (65-70 pounds) packs over that rugged terrain. *Id.* ¶ 25. On a day hike on September 15 at an elevation of approximately 14,000 feet Plotkin developed signs of altitude sickness and was escorted back to camp; two other students developed altitude sickness in the next few days. The instructors changed the course route from hiking through a pass at an altitude of approximately 15,500 feet to a route at a lower elevation back down the Gori Ganga Valley, past the village of Lilam, across the Gori Ganga River on a bridge, and then back upstream to the Ralam Valley. *Id.* ¶ 27. Students hiked 41 miles up the valley following the river the first nineteen days of the hiking section. *Id.* ¶ 28.

September 21, 2011 they were resupplied with a nine day supply of food, which plaintiff alleges would have increased the backpack weight by at least 15.75 pounds. Plotkin's pack was estimated to weigh over 60 pounds on September 22.  Plaintiff also alleges that Plotkin carried more of his tent group's gear and food, because he was stronger than his two female tent mates.  *Id.* ¶ 29.

Plaintiff alleges that Plotkin was not receiving adequate nourishment on the trip and that he and other students were losing weight and muscle.  *Id.* ¶ 30.  On September 22, Plotkin became group leader.  His group left camp at approximately 9:00 a.m., hiked approximately 5.6 miles to their planned destination for the day, arriving at about 1:00 p.m.; the instructors traveled behind the student groups and arrived about 1:30 p.m.  The plan was to camp at that site in Raragari for the night, but there were sheep in the camping area, so the student leaders consulted maps and decided to continue the hike toward Lilam and camp there.  Other students agreed with the plan, as did the instructors.  *Id.* ¶¶ 31, 32. The students had miscalculated the distance to Lilam, in that they failed to account for switchbacks.  They had figured it would be about 3 miles to Lilam, when it was actually 5.6 miles, which would have made the day's hiking total 11.2 miles, more than they had hiked on any previous day.  *Id.* ¶ 33.  Before the students left the Raragari site, the sheep had moved on.  It began to drizzle continuously shortly after they left Raragari.  *Id.* ¶¶ 34, 35.

The trail to Lilam required students to cross under waterfalls, travel on a steep ridge overlooking the Gori Ganga River, and navigate around washed-out paths and landslides. *Id.* ¶ 36.  After they had been hiking for a while, the students realized the distance to Lilam

had been miscalculated.  They were tired and frustrated.  As they hiked the rain was continuous and the trail had become slippery.  Several students had slipped or fallen.  *Id.* ¶¶ 36-38.  The students did not observe any locals on the trail that afternoon.  *Id.* ¶ 39. Some time between 4:00 and 4:45 p.m. the three student groups stopped for a break at a chai shop in Rupsia Bagar.  Plotkin's group, the last group of students, left the chai shop about 5:00 p.m.  It was raining harder and getting dark.  The instructors were 30-40 minutes behind the last student group.  *Id.* ¶ 40.  Plotkin's group caught up to and passed another student group.  The path they were hiking was six feet wide, clung to the mountainside and was strewn with flat, wet rocks.  There was a sharp drop-off to the left of the students that stretched down nearly 300 feet to the rushing Gori Ganga River.  *Id.* ¶ 41.  At about 5:15 p.m., Plotkin was descending the path when his left foot slipped inward on a wet rock; he landed in a seated position near the edge of the trail.  He was pulled over backwards by the weight of his backpack.  Because he had landed so close to the edge of the trail, there was no level ground to fall onto and he fell backwards and head first off the trail and down the steep incline.  The other students yelled his name but he did not answer.  *Id.* ¶ 42.  Two students hiked back to the chai shop to get the instructors who arrived on the scene about half an hour after Plotkin fell.  These same students were sent to Lilam Village, less than a mile downhill from the accident to get ropes and webbing from another group that had reached Lilam.  *Id.* ¶ 43.  Although it was nightfall and the rain was continuing, and the trail was treacherous, the instructors had all the students, including those who had reached Lilam Village, hike back to the chai shop where they camped the

9

next two nights. *Id.* ¶ 44. The instructors tried to rappel down the slope and search for Plotkin; the ropes were not long enough to reach the river. Id. ¶ 45.

After 6:00 p.m. one of the instructors called the NOLS India Office, which then called the NOLS Pacific Northwest Office. Chris Agnew of the NOLS Pacific Northwest Office then called Drew Leemon, NOLS Director of Risk Management in Lander, Wyoming to inform him of the situation. Leemon began to assemble a crisis team. During this whole time, however, the course instructors did not contact or ask for assistance of local officials in either Lilam Village (less than one mile away) or Munsiyari (no more than seven miles away), local residents in the area, or Indo-Tibetan Border Police ("ITBP") (who had a supply post less than a mile away from where Plotkin fell). *Id.* ¶¶ 46-49. Two NOLS India employees were dispatched from Ranikhet to the scene with climbing ropes and rescue gear to aid in the search, but they did not arrive at Lilam Village until 8:00 a.m. the next morning. It was not until 8:00 pm. that someone in the NOLS office contacted the Munsiyari Disaster Management Office about the situation. The Munsiyari Disaster Management Office made plans to meet the two NOLS employees and mobilize additional support. *Id.* ¶¶ 50-52.

Plaintiff further alleges that the next day, local search teams aided in the search and local residents in downstream villages scanned the rivers. Indian military helicopters conducted an air search that day and the next morning. September 23, NOLS employees rappelled down the riverbank below the site of Plotkin's fall. They found his headlamp. *Id.* ¶¶ 53-54. September 24, at approximately 1:30 pm., the NOLS instructors and students

arrived in Munsiyari, reported the incident to local law enforcement, who then interviewed

and took statements of the Course Leader, Andrew Riley, and students who witnessed the

fall. *Id.* ¶¶ 53-55.   September 27, a local search team from Munsiyari, with a NOLS

employee, found Plotkin's backpack lodged between boulders at the river's edge about 0.6

miles downstream from the incident site.   It was presumed that Plotkin had fallen into the

Gori Ganga River and drowned. The ground search for his body continued until October

6, when the search was ended.   Plotkin's body was never found. *Id.* ¶¶ 56-48.   NOLS'

internal investigation concluded Plotkin's death was a tragic accident. *Id.* ¶ 60.   The

complaint alleges that Indian government conducted an independent investigation, in which

a magistrate concluded:

> On 22/09/11, when Thomas Plotkin reported fell into the Gori river at around
> 5:20 pm., NOLS group leaders and other members should have immediately
> taken assistance from villagers and Indo-Tibetan Border Police (ITBP)
> situated at a distance of only one and a half kilometers from the site of the
> fall. However, this was not done.   One never knows whether it could have
> been possible to find Thomas Plotkin with the assistance of villagers and
> ITBP on that very day.   It is therefore regrettable that the sub-divisional
> administration was informed late.   The path to Milam Glacier comprises a
> rough terrain and is very bad in some instances.   Keeping these adverse
> geographical conditions in mind, the possibility of an accident can never be
> denied, and hence it does not seem proper to have trekked that path during
> the evening and under a light drizzle.

*Id.* ¶ 61.

The complaint asserts three claims for relief: (1) negligence; (2) gross negligence,

and (3) willful and wanton negligence.   Count one, negligence, alleges that NOLS owed

Plotkin a duty to exercise reasonable care in the planning, operation, management,

maintenance, control, instruction, and supervision of its program, including but not limited

to providing adequate instruction prior to allowing participants to backpack to remote locations without being accompanied by a course instructor; to provide adequate nutrition and caloric intake through the program; supervise participants in a safe and reasonable manner; establish policies and procedures to avoid unnecessary risk and protect the safety of participants; ensure the immediate availability of emergency rescue equipment in remote locations; and promptly request assistance from local residents and officials in an emergency situation. *Id.* ¶ 63. The duty owed by NOLS was breached in several respects including failure to properly instruct program participants in map reading, distance calculation, effects of adverse weather conditions and risk assessment; failure to provide adequate nutrition and caloric intake; failure to supervise program participants in a safe and reasonable manner; failure to accompany students within reasonable proximity; failure to establish and/or follow policies and procedures to avoid unnecessary risk and protect the safety of participants; failure to ensure the immediate availability of emergency rescue equipment while traveling in a remote location; and failure to promptly request search assistance from local residents and officials to ensure the best chance of locating Plotkin alive. *Id.* ¶ 64. As a result of the negligent acts and omissions, NOLS, through its agents, representatives and employees caused the death of Plotkin by a fall and his presumed drowning. *Id.* ¶ 65. As a result of the negligent acts and omissions, the heirs and next of kin have sustained expenses and suffered damages as set forth in the complaint. *Id.* ¶ 66.

Count two, gross negligence, alleges that NOLS failed to exercise even slight care when the instructors failed to advise the students of their miscalculation of distance from

12

Raragari to Lilam village; failed to consider the inexperience of the students, weight of their backpacks, condition of the trail, growing fatigue of the students, adverse weather conditions and loss of daylight and how it would impact students; failed to advise the students of risks inherent in their proposed plan to continue to Lilam Village; failed to recommend an alternative plan to students, including but not limited to camping at Raragari as planned once the sheep had left or, instead, spending the night at the chai shop; when the instructors decided to travel well behind the students at a distance where they could not observe trail conditions and were unable to quickly respond to emergency situations; when instructors permitted students to travel on unfamiliar rough terrain on a steep trail 300 feet above a river at flood stage, in adverse weather conditions, as dusk approached, and allowed inexperienced students to assume a completely unnecessary risk of injury or death.  *Id.* ¶¶ 68.  As a direct and proximate result of the grossly negligent acts and omissions of NOLS, plaintiff alleges that the premature death of Plotkin by fall and presumed drowning occurred.  Consequently, Plotkin's heirs and next of kin have sustained expenses and seek to recover damages as set forth in the complaint.  *Id.* ¶ 69-70.

Count three, willful and wanton negligence, asserts that at least one of the NOLS instructors accompanying the students had hiked the same trail on multiple occasions, and other instructors on the trip had also hiked the trail prior to this trip.  The instructors knew there was a risk of severe injury or death to students, including Plotkin, if they allowed the them to continue on the trail to Lilam Village after the rain had been falling on an already

treacherous trail for several hours as darkness approached, especially in light of the students' fatigued conditions and while each was carrying a backpack likely in excess of 50 pounds.   Notwithstanding the known perils, the NOLS instructors failed to exercise ordinary care and allowed the students to continue on their perilous journey, constituting willful and wanton negligence.  As a direct and proximate result of NOLS' failures, the premature death of Plotkin by fall and drowning occurred.  The heirs and next of kin seek to recover sustained expenses and damages, as set forth in the complaint.  *Id.* ¶¶ 71-76.

### Parties' Contentions

NOLS asserts that the plaintiff's complaint should be dismissed pursuant to Fed. R. Civ. P. 12(b)(6).  In support of its motion, NOLS relies upon the Student Agreement signed by Plotkin April 30, 2011, which describes activities and risks inherent in NOLS activities, and was signed and acknowledged by Plotkin.  The Student Agreement addresses risks of activities.  It provides:

<u>Activities and Risks</u>

I understand that National Outdoor Leadership School (NOLS) programs live, camp and travel out of doors.  Activities vary from program to program and include, among others, hiking and backpacking through mountainous and other terrain, mountaineering and climbing on rock cliffs, steep snow, ice or glaciers, whitewater kayaking, rafting and canoeing, sea kayaking, ocean sailing, horsepacking, skiing, snowboarding, fishing, and caving.  I further understand and acknowledge that the activities of the programs have risks, including certain risks which are inherent.  Inherent risks are those which cannot be eliminated without destroying the unique character of the activities. The same elements that contribute to the unique character of these activities can cause loss or damage to equipment, accidental injury, illness, or in extreme cases, permanent trauma, disability or death. ....

14

The Student Agreement also provides:

<u>Acknowledgment and Assumption of Inherent and Other Risks</u>

I understand and acknowledge that the description above ("Activities and Risks") of the inherent risks of NOLS' activities is not complete and that other, including unknown or unanticipated, risks, inherent and otherwise, may result in property loss, injury, illness or death. I acknowledge that my participation in this NOLS program is purely voluntary, and I wish to participate in spite of and with knowledge of the inherent and other risks involved. I acknowledge and assume the inherent risks described above and all other inherent risks of my NOLS activity. In addition, except with respect to an injury or other loss which occurs on lands whose rules or regulations prohibit my doing so as a matter of law, I expressly assume ALL risks of enrolling and participating in a NOLS program, inherent or otherwise, and whether or not described above.

And finally, NOLS also relies on the release executed by Plotkin, also in the Student

Agreement, which provides:

<u>Agreements of Release and Indemnity</u>

I hereby release, hold harmless and agree not to sue NOLS, its officers, trustees, agents, and staff including employees, volunteers and interns ("Released Parties"), with respect to any and all claims of loss or damage to person or property by reason of injury, disability, death, or otherwise, suffered by me, or by a minor student for whom I sign, arising in whole or part from my, or the minor student's, enrollment or participation in an activity of NOLS. I agree further to indemnify ("indemnify" meaning to defend, and to pay or reimburse, including costs and attorney's fees) Released Parties against any claim by a member of my, or the minor student's, family, a rescuer, another student, or any other person, arising in whole or part from an injury or other loss suffered by me or caused by me, or by the minor Student, in connection with my, or the minor student's, enrollment or participation in an activity of NOLS. These agreements of Release and Indemnity include claims of negligence of a Released Party, but not of gross negligence or intentionally wrongful conduct. They are intended to be enforced to the fullest extent permitted by law. These agreements of release and indemnity are of no force or effect with respect to an injury or other loss

15

which occurs on lands whose rules or regulations prohibit such agreements
as a matter of law.

The Agreement is not attached to the complaint.  However, it is included in Docket Entry

18-1, 55-59, 14-CV-130, Affidavit of Lori L. Barton, Exhibit G.  This information was offered

with "Defendant NOLS' Motion to Change Venue, or in the Alternative, to Dismiss Based

on Forum Non Conveniens," filed with and considered by the United States District Court

in the District of Minnesota. It has also been reviewed and considered by this Court in

addressing the instant motion.

In response to the arguments concerning the release, the plaintiff has argued the

exculpatory provisions in the Student Agreement are not clear, ambiguous, and overbroad

in scope and would bar plaintiff's claim for negligence only if the jury determined Plotkin's

death was the product of an inherent risk of the recreational opportunity.  Plaintiff also

argues that the facts alleged in the complaint are sufficient to state plausible claims for

negligence, gross negligence and willful and wanton misconduct.

## Discussion

There are three distinct, independent components of the Student Agreement

relevant to the Court's decision here; all have been set out in preceding portions of this

Order.  The first identifies activities and risks of NOLS activities.  The second component

provides an Acknowledgment and Assumption of Inherent and Other Risks of NOLS

activities.  The third component includes the Agreements of Release and Indemnity, which

is the expression of the contracting parties' unambiguous agreement to release NOLS from

liability for negligent acts which include inherent risks and risks which are not inherent.

This language is clear and unambiguous.

The agreement provides a non-exclusive list of inherent risks of NOLS activities, including, by way of example, delays in communication and transportation to medical facilities, equipment failures, travel on rugged trails and terrain, including rivers, rapids, river crossing, steep slopes, slippery rocks, and various environmental risks and hazards. The agreement notes that decisions made by instructors, staff, volunteers, and students are based on a variety of perceptions and evaluations, and may be imprecise and subject to errors in judgments.  Participants may at times travel without instructors. Plotkin, the signator on the Student Agreement, acknowledged and assumed inherent risks of NOLS' activities and acknowledged that other, unknown or unanticipated risks, inherent or otherwise, may result in property loss, injury, illness or death.  He acknowledged a willingness and desire to participate in the NOLS activity with knowledge of inherent and other risks and expressly assumed "ALL risks of enrolling and participating in a NOLS program, inherent or otherwise, and whether or not described above." Doc. 18-1, 56-59.

Plaintiff has argued that the Student Agreement, at most, only releases NOLS from risks inherent in its activities.  The plaintiff offers a multitude of facts that question what an inherent risk is, within the meaning of the Student Agreement.  Simply by way of example, plaintiff suggests it is not an inherent risk when a program participant does not receive adequate calories and nutrition to support the student's ability to participate in the activities of the Semester in India program.  Plaintiff asks whether it is an inherent risk if supervising NOLS instructors do not carry adequate emergency equipment or if, in emergent situations,

17

they fail to seek out the assistance of local residents or local law enforcement who might be better suited to commence immediate search and rescue operations.  Plaintiff contends that NOLS failed to ensure that student participants were adequately instructed regarding specific skills, such as map reading and distance calculations, which would have allowed the student participants to make more informed decisions.   The suggestion is that the training and instruction provided by NOLS was not sufficient to allow student participants to assess the degree of risk and extent of injuries they might have encountered when they elected to proceed to Lilam Village along the perilous trail as darkness fell and as rain continued to fall.

The argument that the Student Agreement only serves to release those risks which are inherent simply ignores the clear and unambiguous language of that agreement.  The release does not merely release negligence claims arising out of risks inherent to the activity.  It releases NOLS "with respect to any and all claims of loss or damage to person or property by reason of injury, disability, death or otherwise, suffered by me . . . arising in whole or part from my . . . enrollment and participation in an activity of NOLS. . . . **These agreements of Release and Indemnity include claims of negligence of a Released Party, but not of gross negligence or intentionally wrongful conduct.  They are intended to be enforced to the fullest extent permitted by law. These agreements of release and indemnity are of no force or effect with respect to an injury or other loss which occurs on lands whose rules or regulations prohibit such agreements as a matter of law."** (Bold emphasis in original).  Doc. 18-1, 56-59. This language is clear and

unambiguous.  This written agreement manifests an intention to release NOLS from all

negligence liability arising out of the program.  The waiver of negligence claims for NOLS

activity-related injuries is not limited to the non-exhaustive list of enumerated inherent risks.

It includes inherent risks and all other risks of NOLS activities.  See *Street v. Darwin*

*Ranch, Inc.*, 75 F. Supp.2d 1296 (D. Wyo. 1999); *Hall v. Perry*, 211 P.3d 489 (Wyo.

2009)(considering release in contract litigation and finding that unambiguous contract

including a release should be enforced according to its terms).  Here, the release expressly

exculpates NOLS from negligence liability and must be given effect.

Exculpatory clauses releasing parties from liability for injury or damages resulting

from negligence are enforceable in Wyoming if the clause is not contrary to public policy.

In *Schutkowski v. Carey*, 725 P.2d 1057 (Wyo. 1986), the Wyoming Supreme Court

identified four factors to consider whether exculpatory agreements are enforceable, subject

to willful misconduct limitations.

> Generally, specific agreements absolving participants and proprietors from
> negligence liability during hazardous recreational activities are enforceable,
> subject to willful misconduct limitations.   *Cain v. Cleveland Parachute*
> *Training Center*, 9 O.R.B. 28, 9 Ohio App.3d 27, 457 N.E.2d 1185 (1983).
> The Ohio court observed in *Cain*:
>
> > "A participant in recreational activity is free to contract with the
> > proprietor of such activity so as to relieve the proprietor of
> > responsibility for damages or injuries to the participant caused
> > by the negligence of the proprietor, except when caused by
> > willful or wanton misconduct. [Citations omitted.]" *Id.*, 457
> > N.E.2d at 1187.
>
> In *Jones v. Dressel*, supra, the Colorado Supreme Court developed
> a four-part test to determine whether a negligence exculpatory clause is
> valid. Pennsylvania courts have also adopted standards which closely

> parallel those in the Colorado case. *Liability Assurance Corporation v.*
> *Greenville Business Men's Association*, 423 Pa. 288, 224 A.2d 620 (1966).
> **In reaching its determination a court considers (1) whether a duty to the**
> **public exists; (2) the nature of the service performed; (3) whether the**
> **contract was fairly entered into; and (4) whether the intention of the**
> **parties is expressed in clear and unambiguous language. Only**
> **exculpatory agreements meeting these requirements are enforceable.**
> *Jones v. Dressel*, supra.

*Schutkowski v. Carey*, 725 P.2d at 1059-1060 (emphasis added).

The plaintiff recognizes that private recreational businesses generally do not qualify as services demanding a special duty to the public nor are their services of a special, highly necessary nature. *Schutkowski v. Carey*, 725 P.2d at 1060. A duty to the public exists if the nature of the business or service affects the public interest and the service performed is considered an essential service. *Milligan v. Big Valley Corp.*, 754 P.2d 1063, 1068 (Wyo. 1988). Participation in the NOLS semester in India program is not a matter of great importance nor essential to the public. The first *Schutkowski* factor is not satisfied.

The second factor, nature of the service performed, is not the type of business that each member of the public may find essential. NOLS is a private recreational business and nothing like the typical service regarded as essential. The types of services that are thought to demand a public duty or that are considered essential have included common carriers, hospitals, doctors, public utilities, innkeepers, public warehousemen, employers, and services involving extra-hazardous activities. *Schutkowski v. Carey*, 725 P.2d at 1060; *Milligan*, 754 P.2d at 1066. The service NOLS provides is not of a special, highly necessary or essential nature. The plaintiff concedes that the experiences provided by NOLS do not satisfy this second *Schutkowski* factor.

20

The third prong of *Schutkowski* requires an inquiry into whether the contract containing the exculpatory provision was fairly entered into. In this case, the Student Agreement does not involve a severe disparity of bargaining power. *Milligan* provides that a disparity of bargaining power may be found when a contracting party with little or no bargaining power has no reasonable alternative to entering the contract at the mercy of the other's negligence. *Milligan*, 754 P.2d at 1066-1067. The plaintiff has argued that Plotkin may have been fraudulently induced into signing the Student Agreement, and offers as an example, that the enrollment packet sent to Plotkin included a list of things a student could expect in the course, such as well-trained and qualified instructors. This argument is unavailing. As in *Milligan*, Plotkin, an adult, was not forced into participating in the NOLS Semester in India program. Participation in the NOLS program certainly was not a matter of practical necessity for the public nor was it an essential service. The fact that a contract may be on a form prepared by one party and on a "take it or leave it basis" fails to establish an adhesive contract involving a disparity of bargaining power. Plotkin could have elected not to participate in the NOLS program. He did not do so. The Court finds that the plaintiff cannot satisfy the third factor of the *Schutkowski* test.

The fourth *Schutkowski* factor requires a determination as to whether the release agreement evidences the parties' clear intent to release NOLS from liability for negligence in clear and unambiguous language. The express language of the Student Agreement does evidence the parties' intent to release NOLS from liability for negligent acts in clear and unambiguous language. The release expressly releases NOLS, its officers, trustees,

21

agents, and staff including employees, volunteers and interns ("Released Parties") from "claims of negligence of a Released Party, but not of gross negligence or intentionally wrongful conduct." Doc. 18-1, 58. This fourth factor supports a finding that the exculpatory agreement is enforceable according to its terms. The release of all negligence claims by Plotkin will be given effect.

As to the gross negligence and willful and wanton misconduct claims, the Court finds that the plaintiff's allegations do not rise to the level of gross negligence or willful and wanton misconduct. These are complaints of negligent failures and do not defeat the motion to dismiss.

In support of the claims for gross negligence and willful and wanton misconduct, the plaintiff's complaint describes many of the same decisions and judgments that were made by NOLS instructors, student leaders and student participants on the trip.  But these allegations belie the contention that these failures are evidence of gross negligence or of willful and wanton misconduct. For example, when Plotkin showed signs and symptoms of developing altitude sickness, he was brought to a lower elevation and permitted to recover. The decision was made to alter the planned hiking route to another that would allow the hike to be undertaken on a trail at a lower elevation.  The hiking route was changed, with the plan to hike back down the Gori Ganga Valley past the Lilam Village, cross the Gori Ganga River on a bridge, and hike back upstream to the Ralam Valley. Over a period of 19 days, the students had hiked approximately 41 miles up the valley following the Gori Ganga River. Complaint ¶¶ 27, 28. Plaintiff offers factual allegations that

she contends demonstrate NOLS knew or should have known Plotkin would slip and fall when the decision was made to continue the hike to Lilam Village. As the defendant has noted, plaintiff has alleged many misjudgments on the part of NOLS, such as insufficient nutrition and map reading skills, to support the claim Plotkin's fall could have been avoided. But these claims are speculative and fall far short of a gross negligence or willful and wanton misconduct standard.

As the Tenth Circuit has stated, factual allegations must plausibly suggest the defendant is liable on the claims asserting gross negligence or willful and wanton misconduct. The allegations must be enough that, if assumed to be true, the plaintiff plausibly, not just speculatively, has a claim for relief. *Corder v. Lewis Palmer School Dist. No. 38,* cited in *Interstate Fire & Cas. Co. v. Apartment Management Consultants, LLC,* 2015 WL 5165858, *6 (D. Wyo. 2015). While the Rule 12(b)(6) standard is less demanding than that employed in reviewing motions for summary judgment, it still has some teeth and requires a plaintiff to do more than speculate. None of the allegations in the complaint rise to the level of gross negligence or willful and wanton misconduct. At best, they are factual allegations that assert the defendant was negligent. Nothing alleged shows egregious, intentional misconduct in reckless disregard of the consequences, an extreme departure from ordinary care in a situation where a high degree is apparent.

Claims for willful and wanton misconduct cannot be waived by an exculpatory agreement. *Street v. Darwin Ranch, Inc.*, 75 F. Supp.2d at 1299, n.5. The language of the release at issue in this case excludes claims of gross negligence or intentionally

23

wrongful conduct.  The Wyoming Court has discussed gross negligence and willful and wanton misconduct in a number of cases.  In *Mayflower Restaurant Co. v. Griego*, 741 P.2d 1106, 1115 (Wyo. 1987), the Wyoming Court stated:

> "Although degrees of negligence are not considered in comparative negligence, it must be remembered that the traditional concept of gross negligence visualized less culpable conduct than willful and wanton conduct. Gross negligence has been defined as:
>
>> " ' * * * Indifference to present legal duty and to utter forgetfulness of legal obligations so far as other persons may be affected. It is a heedless and palpable violation of legal duty respecting the rights of others. The element of culpability which characterizes all negligence is in gross negligence magnified to a high degree as compared with that present in ordinary negligence. Gross negligence is a manifestly smaller amount of watchfulness and circumspection than the circumstances require of a person of ordinary prudence. But it is something less than the willful, wanton and reckless conduct. * * * ' *Altman v. Aronson*, 231 Mass. 588, 121 N.E. 505, 506, 4 A.L.R. 1185 (1919).

*Id.* at 1115. Said otherwise, "*gross negligence* is a degree of negligence substantially greater than ordinary negligence, although something short of *willful and wanton misconduct*." *Moore v. Kondziela*, 405 P.2d 788, 789 (Wyo. 1965)(italics in original).

In *Milligan v. Big Valley Corp.*, 754 P.2d 1063 (Wyo. 1988), the Wyoming Supreme Court also considered whether the exculpatory agreement could extinguish liability for willful and wanton conduct. "Where willful and wanton misconduct is shown, an otherwise valid release is unenforceable." *Milligan*, 754 P.2d at 1068 (citing *Schutkowski v. Carey*). The Wyoming Court's discussion continues:

> In *Weaver v. Mitchell*, Wyo., 715 P.2d 1361, 1370 (1986), this court defined willful and wanton misconduct as follows:

24

> "Willful and wanton misconduct is the intentional doing of an act, or an intentional failure to do an act, in reckless disregard of the consequences and under circumstances and conditions that a reasonable person would know, or have reason to know that such conduct would, in a high degree of probability, result in harm to another."

See also *Danculovich v. Brown*, Wyo., 593 P.2d 187, 191 (1979), wherein we said that willful and wanton misconduct was

> "that which tends to take on the aspect of highly unreasonable conduct, or an extreme departure from ordinary care, in a situation where a high degree of danger is apparent. It is not with the intent to cause injury or damage, but it must be more than mere mistake resulting from inexperience, excitement or confusion, and more than mere thoughtlessness or inadventure, or simple inattention."

We affirmed summary judgment because of the nonexistence of a genuine issue of material fact regarding willful misconduct in *Bryant v. Hornbuckle*, Wyo., 728 P.2d 1132 (1986). In *Bryant*, a worker applied heat with a butane torch to a frozen valve on a water truck, resulting in an explosion. He brought an action against the foreman who instructed him on the use of the butane torch thawing method. The foreman produced evidence sufficient to constitute a prima facie showing that there was no genuine issue of material fact on the question of willful misconduct. This showing being unrefuted by appellant, we upheld summary judgment in favor of appellee. *Id.* at 1137.

> Applying the *Weaver* definition to this case, Big Valley Corporation is guilty of willful and wanton misconduct only if it deliberately acted, or failed to act, in reckless disregard of the consequences or in a manner that evidenced a high degree of probability that harm would result to others.

*Milligan*, 754 P.2d at 1068-1069. See also *Adams v. Jones Paint & Glass, Inc.*, Unreported Disposition, Text at 2012 WL 8749215 (Wyo. 2012).

The allegations in the complaint do not suggest that the defendant acted in utter disregard for the safety of student participants so as to support either a claim for gross negligence or a claim for willful and wanton misconduct. The allegations in the complaint

25

do not take on the aspect of highly unreasonable conduct, or an extreme departure from ordinary care, in a situation where a high degree of danger is apparent. The allegations do suggest that mistakes were made and poor judgments may have been made. However, the allegations do not scale the hurdles required to show more culpable conduct that would permit claims for gross negligence or willful and wanton misconduct to survive the motion to dismiss.

Because this matter is before the Court on a Rule 12(b)(6) motion to dismiss, the Court is again mindful of the applicable standard of review. In a nutshell, this standard requires the Court to review the complaint to assess whether a claim has facial plausibility and whether the plaintiff has pled factual content that allows the Court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The allegations must rise above a speculative level and create more than a suspicion of a legally cognizable right of action.

The Rule 12(b)(6) analysis is a context-specific task that requires this reviewing court to draw on its judicial experience and common sense. *Ashcroft v. Iqbal*, 556 U.S. 662, 679. The NOLS Semester in India program is an adventurous, outdoor wilderness experience. The program is one where students are exposed to unique inherent and other risks; they face challenges they would not otherwise meet. These are not the same risks that a student might typically be exposed to on a college campus. The college campus risk, whatever that risk might be, may warrant a different evaluation of a defendant's conduct to determine if it was grossly negligent or engaged in willful and wanton

misconduct. The NOLS program is designed to teach students, challenge them to expand skills and exercise judgment while engaging in unique, physically demanding activities that have risks that "cannot be eliminated without destroying the unique character of the activities." Doc. 18-1, 56-59. Again, context is important.

The plaintiff has offered the same factual allegations to support the three claims for relief asserted in the complaint, including negligence, gross negligence and willful and wanton misconduct. Viewed in a light most favorable to the plaintiff, the allegations do not support any inference that NOLS was indifferent to its legal duties and utterly forgetful of legal obligations as far as other persons, including Plotkin, may have been affected nor do they demonstrate a heedless and palpable violation of legal duty respecting the rights of others. No plausible claim for gross negligence has been stated.

The same proffered allegations do not support a claim for reckless or willful or wanton misconduct. Again, viewed in a light most favorable to plaintiff, the allegations do not support a state of mind that remotely approaches an intention to do harm. At best, the allegations may show serious errors or lapses in judgment, which may have demonstrated that the defendant may have acted negligently. As discussed above, however, the release of claims for negligence is enforceable and precludes plaintiff from proceeding on any negligence claim. Having been released, the negligence claim fails. Additionally, the factual allegations underlying the claim for willful and wanton misconduct are not sufficient to nudge that claim across the line from conceivable to plausible.

There is no question that the facts of this case are tragic and heart-rending,

27

especially for a mother who has lost a son.  However, the Court must give effect to the exculpatory agreement and the parties' clear intent to release NOLS from liability for negligence.  Adults contracting to engage in activities that present extraordinary hazards and challenges should not do so lightly.  The Student Agreement is unambiguous and it will be enforced.  The Court also finds that the facts alleged in the complaint do not support cognizable claims for gross negligence or willful and wanton misconduct.

For all the reasons stated above, the defendant's motion seeking to dismiss all claims for relief pursuant to Fed. R. Civ. P. 12(b)(6) will be granted.  Accordingly, it is therefore

**ORDERED** that the defendant's Motion to Dismiss All Claims for Relief (Doc. 32) shall be, and is, **GRANTED.  It is further**

**ORDERED** that the above captioned matter shall be, and is, **DISMISSED WITH PREJUDICE.**

Dated this _8th_ day of _October_ 2015.

_Alan B. Johnson_

ALAN B. JOHNSON
UNITED STATES DISTRICT JUDGE

28